IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MICHAEL DAVID,

                Petitioner,

    v.

J.A. ECKARD et al.,

                Respondents.

CIVIL ACTION
NO. 14-7123

## OPINION

**Slomsky, J.**                                                    **August 4, 2017**

## I.    INTRODUCTION

Before the Court is the Petition of Michael David ("Petitioner") for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. (Doc. No. 1.) Petitioner seeks relief based on his claim that his Confrontation Clause rights were violated by the admission of his co-defendant's redacted police statement. (Id.) Following a review of the filings by the parties and the pertinent record, United States Magistrate Judge Timothy R. Rice issued a Report, recommending that the Petition for Writ of Habeas Corpus be granted and that a certificate of appealability be issued. (Doc. No. 32.) J.A. Eckard, the District Attorney of Philadelphia County, and the Attorney General for the State of Pennsylvania (collectively "Respondents"), filed a response to the Report and Recommendation containing their objections. (Doc. No. 38.) For reasons that follow, the Court will adopt the Report and Recommendation and will grant the Petition for Writ of Habeas Corpus.

## II.    BACKGROUND[1]

On December 3, 2005, Craig Clayton, a vendor who sold sporting goods and other wares from his car, was shot to death on the 1800 block of Clementine Street in Philadelphia, Pennsylvania.  (Doc. No. 32 at 1, 7.)  The Commonwealth charged Petitioner Michael David and Christopher Jones with murder, robbery, possessing an instrument of a crime, and criminal conspiracy based on Jones's confession, witness identifications, phone records, and annotations in a notebook found on the victim.  (Id. at 7.)  The Commonwealth's theory of the case was that the shooting occurred after David and Jones convinced Clayton to meet them with the promise that they would purchase shoes from Clayton's sporting goods collection.

In June 2007, David was tried alone for the murder of Craig Clayton.  (Id. at 1.)  The jury, however, was unable to reach a verdict and the trial court granted a mistrial.  (Id.)

In February 2008, David was re-tried with co-defendant Jones, who had previously given a statement to police implicating both himself and David in the murder.  (Id.)  Over David's objection, the trial court denied a severance and allowed the prosecution to introduce Jones's statement to the jury.  (Id. at 6.)  David's name was redacted and replaced with references to "the person who shot" Clayton, "he," "him," "the shooter," and "the other guy."  (Id.)  The trial judge offered a limiting instruction before the statement was read and before deliberations, informing the jury that they could not consider Jones's statement against David.  (Id. at 9.)

On February 15, 2008, Petitioner was convicted of second-degree murder, robbery, possession of an instrument of a crime ("PIC"), and criminal conspiracy.[2]  He was sentenced to life imprisonment for his murder conviction with concurrent terms of 12-16 months for his PIC

---

[1] The information in this Section derives from Judge Rice's Report and Recommendation (Doc. No. 32) as well as all the documents of record in this case.

[2] Co-defendant Jones was convicted of third-degree murder, robbery, and criminal conspiracy. (Doc. No. 32 at 9 n.7.)

conviction and 90-180 months for his criminal conspiracy conviction.  (Id. at 9.)  He is currently

incarcerated at the State Correctional Institution in Huntingdon, Pennsylvania.  (Id. at 1.)

The facts leading to the conviction are summarized in the R&R as follows:

The evidence showed that around 9:30 p.m. on Friday, December 2, 2005, Hector Caceres returned to his home on the 1800 block of Clementine Street in Philadelphia.  N.T. 2/5/2008 at 265.  After parking his car on the corner, he saw a black man in a dark coat with a black hat.  Id. at 266.  He saw another black man down the street.  Id. at 266, 272.  He could not see the men's faces in the dark, but knew he had never seen them before.  Id. at 266-67.

About an hour later, Monica Yancey, another resident of the 1800 block of Clementine Street, also saw two men standing approximately seven-to-eight feet from her on the street.  N.T. 2/7/2008 at 203-04, 208.  She was able to see the men's faces under the street lighting, but did not recognize them.  Id. at 207-08.

The next day, around 10:40 a.m., Caceres saw the same men from the previous evening in the same locations.  N.T. 2/5/2008 at 268, 270, 273.  Around the same time, Yancey was in her upstairs bedroom looking out the front window for her daughter, Brandy Saunders.  N.T. 2/7/2008 at 202-03, 209, 212.  Yancey was not wearing her glasses but alleged that did not impact her view.  Id. at 210.  Yancey noticed the same men from the previous night on the street, and saw one of the men talk to Saunders as she walked down the street.  Id. at 215, 235- 36.

Saunders testified that the shorter man, who was wearing an olive-colored coat and hat and tan Timberland boots, called to her, "Shorty, in the red coat."  N.T. 2/6/2008 at 135-36.  Saunders glanced at the man and kept walking to her mother's house.  Id. at 136.  She then heard the taller man, who was talking on a cell phone and wearing a black coat and hat and dark colored boots, say "it's about to happen in five minutes."  Id. at 135-36.  Saunders quickly walked in her mother's house.  Id. at 137.

Saunders and Yancey were upstairs talking when they heard a popping sound.  N.T. 2/7/2008 at 216-17.  Yancey ran outside and saw the same men standing side-by-side across the street with their heads slightly tilted down.  Id. at 217-25.  Yancey yelled that she was calling the cops.  Id. at 225. The taller man looked at her and ran away.  Id. at 225-27.  The shorter man ran in the opposite direction; he had a black garbage bag with something square in it underneath his arm.  Id. at 226, 229-30.  Yancey called 911, reporting that she thought the men had broken into a car, but she was having difficulty seeing without her glasses.  Id. at 228-29, 263.

On the same morning, twelve-year-old Briana O'Brien was looking for clothes in the back seat of a van parked on Clementine Street.  N.T. 2/5/2008 at 216-19.  She

heard people arguing behind her and saw a taller man with a green sweatshirt pointing a gun at another man, who had his hands up. Id. at 222-25, 231-32. A third man, who was shorter than the man with the gun, was across the street talking on his phone. Id. at 224. O'Brien then saw the taller man shoot the man who had his hands up. Id. at 226. O'Brien ran to her house and the taller man fled from the scene. Id. at 225-326. The shorter man fled in the opposite direction. Id. at 251-52. O'Brien did not see Yancey or hear her yell at the men. Id. at 245-46.

Police arrived shortly after the shooting and discovered a body on the ground. Id. at 230-31, 236-37. The victim was pronounced dead and later identified as Craig Clayton, a vendor who sold clothing and shoes from a street stand, out of his van, and online. N.T. 2/7/2008 at 68-69, 74-75. Police removed from Clayton's body: jewelry, Clayton's business card, a crack pipe, pills, and a notebook. N.T. 2/6/2008 at 72-73, 78-79, 86, 97-99. In the notebook, Clayton had written various names, phone numbers, addresses, and appointments. Id. at 89-90; N.T. 2/7/2008 at 76-77. On page 4, Clayton had written: 1833 Clementine, Mike, (215) 888-2400, (267) 262-5094, Size 12 Tims. N.T. 2/6/2008 at 75.

(Id. at 2-4.) Police immediately started to investigate the murder. (Id. at 4.) Officers:

drove Yancey and Saunders around to try to identify the suspects. N.T. 2/7/2008 at 237. They stopped several men, but the witnesses said none of them looked like the suspects. Id. Police then took the women to the police department, where they were separately interviewed by different officers. Id. at 237-38; N.T. 2/6/2008 at 140. Yancey described the taller man as: 19-23 years old, 5'9" to 5'10", about 200 pounds, brown skinned, and wearing a black sweatshirt-type jacket, a hood, blue jeans, and tan Timberland boots. Id. at 307-08. She described the shorter man as: 19-23 years old, 5'5" to 5'7" feet tall, 225-250 pounds, light-brown complexion, a little bit of facial hair on his cheeks, and wearing a green Army jacket and hood. Id. at 304-06. Saunders told the police that she did not quite remember what the men looked like, but nevertheless gave descriptions that were similar to those provided by Yancey. N.T. 2/6/2008 at 188, 178-79 (describing shorter man as between 5'5" and 5'7", medium build, mustache, faded beard, and wearing a green coat, green hat, and light-colored boots and describing taller man as between 5'9" and 6', light complexion, and wearing a black coat, black hat, and dark colored boots).

(Id.) Police arrested Petitioner a few weeks after the murder based on Yancey's identification, which was described in the R&R as follows:

On December 20, 2005, police showed Yancey pictures of eight different men, including an older photograph of David as a teenager, and advised Yancey not to pick anybody unless she was 100 percent sure it was one of the men she saw on December 2 and 3.

4

N.T. 2/7/2008 at 94-95, 241-43. Yancey identified David's photograph and David was arrested for Clayton's murder two days later. Id. at 133-34, 243-44.

Yancey identified David again during a line-up of eight men approximately three months later and during the trial. Id. at 218-19, 248-49. Although Saunders also was scheduled to view a line-up with David, it was canceled. N.T. 2/6/2008 at 165-66; N.T. 2/7/2008 at 271. Around the same time, Saunders complained to Yancey about going to the line-up because she could not remember what the men looked like. N.T. 2/7/2008 at 271, 348.

Although Yancey identified David during the prior mistrial, Saunders did not. N.T. 2/6/2008 at 157. During the second trial, however, Saunders identified David as the taller man she saw on December 3, 2005. Id. at 144.

(Id. at 4-5.) At trial, the Commonwealth relied on Yancey and Saunders' witness identifications, phone records, and annotations in the notebook found on the victim to convict Petitioner.[3]

In addition, the Commonwealth introduced Christopher Jones's confession to the jury as evidence that Jones participated in the murder and robbery of Craig Clayton. The R&R described the manner in which police arrested Jones:

Shortly after the crime, police found Clayton's van parked near Clementine Street. N.T. 2/7/2008 at 117-18. Clayton's cell phone was inside the van and showed that the last incoming call was made at 10:49 a.m. on December 3 by the 215-888-2400 number (the "888 Number") written on page 4 of Clayton's notebook. Id. at 121. The last outgoing call was several minutes later at 11:03 a.m. to the same 888 Number. Id. at 119-20.

Phone records revealed that the 888 Number was registered to Dolores Johnson and that numerous calls were made between the 888 Number and Clayton's cell phone on December 2 and 3. N.T. 2/6/2008 at 223-39. Police subsequently contacted Johnson and Johnson's grandson, co-defendant Jones. N.T. 2/7/2008, at 100-01, 115.

On November 17, 2006, Yancey was shown pictures of eight different men, including Jones, and identified Jones as the second man involved in the incident. N.T. 2/7/2006 at 244-45. Approximately ten days later, police arrested Jones. Id. at 111, 160.

_____

[3] Caceres and O'Brien were not asked to identify Petitioner at trial. (Doc. No. 32 at 5.)

5

(Id. at 5-6.)  After his arrest, Jones was advised of his rights and made a statement to Detective John Cahill implicating Petitioner and himself in Clayton's murder.  (Id. at 6.)

Jones did not testify at trial, so the Commonwealth had Detective Cahill read Jones's statement to the jury.  (Id.)  Petitioner's name was redacted and replaced with references such as "the person who shot" the victim, "he," "him," "the shooter," and "the other guy."  (Id.)  The trial court also instructed the jury that it could consider the statement only in evaluating the evidence against Jones, and not against Petitioner.  (Id.)

On February 7, 2008, Detective Cahill read Jones's statement to the jury as follows:

The Court:      Members of the jury, you are about to hear a statement that the detective will be testifying to.  This is evidence which may only be considered by you in evaluating the evidence as regards Mr. Jones.  You may in no way consider anything in there as regards Mr. David.

Detective Cahill:      Question: After being warned of your Constitutional rights, do you at this time wish to make a statement concerning the shooting death of a black male identified as Craig Clayton on 12/3/05 on the highway at 1800 East Clementine Street?

Answer: Yes.

Question: Do you know Craig Clayton?

Answer: No.

Question: Were you present on 12/3/05 in the 1800 block of East Clementine Street when Craig Clayton was shot and killed?

Answer: Yes.

Question: Did you shoot and kill Craig Clayton?

Answer: No.

Question: Do you know who shot and killed Craig Clayton?

Answer: Yes.

Question: How long have you known the person who shot Craig Clayton?

Answer: I met him two days before the shooting.

Prosecution: Now, at the conclusion of this page, before we go any further, is there anything contained at the end of the page?

Detective Cahill: Yes; Mr. Jones's signature.

Prosecution: And on each of the questions, is there anything that you did?

Detective Cahill: Mr. Jones, at the conclusion of the statement, was given the opportunity to read the statement. He placed his initials on the bottom of each page.

Prosecution: And you requested that he do this?

Detective Cahill: Yes, I did.

The Court: That was at the conclusion of the entire statement?

Detective Cahill: This is correct, your honor.

Prosecution: Thank you, your honor. Turning your attention, Detective, to page 2. Detective.

Detective Cahill: Okay. Question: How did you meet him?

Answer: I met him through a guy named Kyle.

Question: Where did you meet him?

Answer: I was with my peoples at 19th and Dauphin. I heard Kyle and the guy talking about getting some sneakers. And at the time I was wearing some Jordan sneakers, and they told me that the sneaker man had a whole lot of Jordans in different colors. And I told 'em that I wanted some, and that is how I got associated with the other guy. He then asked to use my cell phone, and he called the sneaker man. But I don't know if he got through to him or not.

Question: Do you know Kyle's full name?

Answer: No.

Question: When did you see . . . Give me a second your Honor. Appears to say, When did you see the shooter again?

Answer: The next day I saw him at 19th and Dauphin, and he used my phone again and called the sneaker man again and told him what kind of sneaks he wanted. He also told the sneaker man that he wanted to see what kind of sneaks he had.

Question: Did this conversation take place a day before the murder?

Answer: This took place that night before the murder.

Question: How many times did he talk to the sneaker man with your phone the night before the murder?

[Answer:] He spoke with the guy about five or six times the night before.

Question: Did he tell you anything after he spoke with the sneaker man the night before the murder?

Answer: After the last time he spoke with the sneaker man, he told me that he was going to meet him tomorrow?

Question: What happened next?

Answer: The next day, which was the day of the murder, I met him again at 19th and Dauphin. And then another guy pulled up in a gold-colored car and he drove me—and he drove both of us down to Clementine Street and then dropped us off and drove off.

Question: About what time did the other guy in the gold car drop you and the other guy off?

Answer: It was in the morning. I don't know what time.

Question: Do you know the guy who was driving the gold car?

Answer: No.

Question: What were you and the other guy going to do when the sneaker man arrived with the sneakers?

Answer: We were going to rob him of his—of the sneakers.

Question: How long were both of you waiting for the guy with the sneakers?

Answer: We waited for about 45 minutes for the guy.

Question: Did the other guy talk to the sneaker man on your phone while the two of you were waiting for him?

Answer: Yes.

Question: How many times did the other guy speak with the sneaker man on your phone?

Answer: He spoke with him two or three times. And the last time he spoke with the sneaker man, he told me that the sneaker man was on his way.

Question: Where did the two of you wait on Clementine Street?

Answer: We were in the middle of the block.

Question: What happened when the sneaker man arrived on Clementine Street?

Answer: I saw the sneaker man walking up Clementine Street in the middle of the street, and he was carrying a black bag. I was on the phone when the sneaker man walked up, and he and the other guy started arguing. And then I hung up, and the other guy then tried to grab the bag and the sneaker man—from the sneaker man. And the sneaker man pushed him.

And then the other guy took out the gun, and he told him to give up the sneaks. And then the other guy shot the sneaker man. After the sneaker man fell down, we—we were both standing over the guy. And then the other guy went through the sneaker man's pockets, and he took the watch off his wrist. He also took a Bluetooth earpiece from

the sneaker man, along with the black bag that the sneaker man was carrying.

Question: What happened after the shooting?

[Answer:] The other guy ran up Clementine Street towards Kensington Avenue, and I went down Clementine the other way.

Question: Where did you go after the shooting?

Answer: I walked up and down some streets. I made my way to Allegheny Avenue, and I caught the 60 bus, and I went to work at Pep Boys at Hunting Park and Allegheny.

Question: Did you see or speak with the other guy after the shooting?

Answer: No. I haven't talked to or seen him since then.

Question: I am now showing you a photo.

(Cellular phone rings.)

Detective Cahill:     Not me.

The Court:            I'm sorry. I am now showing you what?

Detective Cahill:     [Continues reading statement] I am now showing you a photo which I want you to look at and tell me if you know who the person is that is depicted in this photo.

Answer: That is the sneaker man. [He identified a BMV photo, which is a driver's license photo, of Craig Clayton.]

Question: Have you ever seen Craig Clayton before 12/3/05?

Answer: No.

Question: How far did you go in school?

Answer: 11th grade.

Question: Do you read, write, and understand English?

> Answer: Yes.
>
> Question: Are you presently under the influence of drugs or alcohol?
>
> Answer: No.
>
> Question: Is there anything else that you want to tell me about the murder of Craig Clayton?
>
> Answer: There's nothing else I can say. I told you everything.
>
> Question: Are you willing to read over the statement which consists of four pages and sign it if it is true and correct and without any threats or promises being made to you?
>
> Answer: Yes.
>
> Prosecution: Now, at the conclusion of typing that statement with the question-and-answer process that you have described, what did you do then?
>
> Detective Cahill: I had the defendant read over the entire statement. I instructed him to make any changes, corrections, additions, whatever he wished to do to the statement. I instructed him to initial after each of his answers and to sign the bottom of each page.
>
> Prosecution: And did he do that?
>
> Detective Cahill: Yes, sir, he did.

(N.T. 2/7/2008 at 171:12-181:12.) Detective Cahill further testified that Jones reviewed and signed the statement at the time it was made. (Id. at 182:11-183:15.)

During closing arguments, the Commonwealth emphasized Jones's statement, explaining that:

> From the statement – and it's clear – they were going there to rob Craig. They knew he was the sneaker man. . . . And they lured the sneaker man from the area that he usually sold at, Kensington and Allegheny, onto Clementine Street. . . .

(Doc. No. 32 at 9 (quoting N.T. 2/13/2008 at 271).) Although the prosecutor noted that the court would tell the jury that Jones's statement could only be used against Jones, he also said that the statement clearly explained the conspiracy to rob Clayton. (Id.) At the conclusion of the case, the trial court gave a limiting instruction in reference to Jones's statement informing the jury that the statement could be used only against Jones, and not Petitioner. (Id.) However, during deliberations, the jury requested a copy of Jones's statement. (Id.) The R&R stated that:

> The trial court told the jury that it could not review the statement, but it could be reread to them. Id. at 89-90. At the jury's request, the statement was read to them twice. Id. at 91-118. The trial court denied the defense's request to have the limiting instruction reread each time. Id. at 91, 108-09.

(Id.) The jury then found Petitioner guilty of second-degree murder, robbery, possession of an instrument of a crime ("PIC"), and criminal conspiracy. (Id.)

In November 2009, the Superior Court affirmed David's judgment of sentence and in May 2010, the Supreme Court of Pennsylvania denied review. (Id.) On May 27, 2010, David filed a timely pro se petition pursuant to Pennsylvania's Post-Conviction Relief Act ("PCRA"), 41 Pa. C.S. § 9541, et seq. (Id. at 10.) In November 2011, after being appointed counsel, David filed an amended petition. (Id.) Then, David requested to proceed pro se, and after two hearings, the PCRA court granted his request, finding waiver of counsel was knowing, intelligent, and voluntary. (Id.)

In October 2013, the PCRA court dismissed David's PCRA petition. (Id.) The Superior Court affirmed the dismissal of David's petition the following year. (Id.)

On November 30, 2014, David filed a timely federal habeas petition. (Doc. No. 1.) On December 23, 2014, this case was referred to United States Magistrate Judge Timothy R. Rice for a Report and Recommendation. (Doc. No. 2.) On March 16, 2016, this Court stayed the action pending a decision by the United States Supreme Court on whether to grant certiorari in

<u>Washington v. Secretary Pa. Dept. of Corrections</u>, 801 F.3d 160 (3d Cir. 2015). (Doc. No. 29.) The Supreme Court denied certiorari in <u>Washington</u>, so this Court granted Petitioner's Motion to Lift the Stay. (Doc. No. 31.) On January 19, 2017, the Magistrate Judge issued a Report, recommending that the Petition for Writ of Habeas Corpus be granted and that a certificate of appealability be issued. (Doc. No. 32.) On March 13, 2017, Respondent filed his Objections to the Report and Recommendation. (Doc. No. 38.) The Petition is now ripe for review.

## III.    STANDARD OF REVIEW

Under 28 U.S.C. § 636(b)(1)(B) and the local rules of this Court, a district judge is permitted to designate a magistrate judge to make proposed findings and recommendations on petitions for post-conviction relief. Any party may file objections in response to the magistrate judge's report and recommendation. <u>Id.</u> at § 636(b)(1)(C). Whether or not an objection is made, a district judge "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The [district] judge may also receive further evidence or recommit the matter to the magistrate judge with further instructions." <u>Id.</u> "[I]t must be assumed that the normal practice of the district judge is to give some reasoned consideration to the magistrate's report before adopting it as the decision of the court." <u>Henderson v. Carlson</u>, 812 F.2d 874, 878 (3d Cir.1987); <u>see also</u> 28 U.S.C. § 636(b).

In the Eastern District of Pennsylvania, Local Rule 72.1.IV(b) governs a party's objections to a magistrate judge's report and recommendation. Under that rule, a party must "specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections[.]" <u>Savior v. Superintendent of Huntingdon SCI</u>, No. 11-5639, 2012 WL 4206566, at *1 (E.D. Pa. Sept. 20, 2012). Upon review, "[a district judge] shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). De novo

review is nondeferential and generally permits the district court to conduct an "independent review" of the entire matter.  Salve Regina College v. Russell, 499 U.S. 225, 238 (1991). "Although [the] review is de novo, [a district judge] [is] permitted, by statute, to rely upon the magistrate judge's proposed findings and recommendations to the extent [the judge], in the exercise of sound discretion, deem[s] proper."  Owens v. Beard, 829 F. Supp. 736, 738 (M.D. Pa. 1993) (citing United States v. Raddatz, 447 U.S. 667, 676 (1980)).

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal habeas petition may not be granted on any claim which was adjudicated on the merits in state court proceedings unless Petitioner can show that the adjudication of claims either:

> (1)  resulted in a decision that was contrary to, or involved in an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  The United States Supreme Court has defined clearly established law as "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision."  Lockyear v. Andrade, 538 U.S. 63, 71-72 (2003).

Under the AEDPA, review of state court legal and factual determinations is highly deferential.  See Palmer v. Hendricks, 592 U.S. 386, 392 (3d Cir. 2010) (stating that the "AEDPA requires federal courts collaterally reviewing state proceedings to afford considerable deference to state courts' legal and factual determinations.").  If a state court did not adjudicate a claim on the merits, however, the deferential standard of the AEDPA does not apply.  Id.  Rather, in such cases, "the federal habeas corpus court must conduct a de novo review over pure legal questions and mixed questions of law and fact . . . ."  Appel v. Horn, 250 F.3d 203, 210 (3d Cir. 2001).

A state court ruling is "contrary to" clearly established federal law for the purposes of §

2254(d)(1) "if the state court applies a rule that contradicts the governing law set forth in

[Supreme Court] cases." Williams v. Taylor, 529 U.S. 362, 405-06 (2000).

A state court decision constitutes an "unreasonable application" of Supreme Court

precedent if it identifies the correct governing legal rule from Supreme Court decisions, but

"unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407-08. The

state court's ruling must be "objectively unreasonable, not merely wrong." Virginia v. LeBlanc,

137 S.Ct. 1726, 1728 (2017) (internal citation omitted). The state court's factual findings must

be presumed correct unless the petitioner can show otherwise by clear and convincing evidence.

See 28 U.S.C. § 2254(e)(1); see also Miller-El v. Cockrell, 537 U.S. 322, 340-41 (2003).

## IV.     ANALYSIS

David raised four bases for relief in his Petition for Writ of Habeas Corpus. (Doc. No. 1

at 5-10.) His asserted grounds for relief are as follows:

> 1. The state appellate court unreasonably applied the Confrontation Clause by
>    denying a severance and approving the admission of the co-defendant's redacted
>    confession at Petitioner's joint trial.
>
> 2. Petitioner was denied his Sixth Amendment right to confront a witness.
>
> 3. Petitioner was denied his Fourteenth Amendment right to due process by way of
>    insufficient evidence of a robbery.
>
> 4. Trial counsel was ineffective for failure to investigate and present all phone
>    records at trial.[4]

---

[4] Petitioner's third and fourth claims were not addressed in the R&R because Judge Rice found
that the writ of habeas corpus should be issued based on Petitioner's Confrontation Clause
claims. (Doc. No. 32 at 23 n.15.)

(Id.)  The Magistrate Judge reviewed the first two claims dealing with alleged violations of Petitioner's rights under the Confrontation Clause and this Court likewise will do so now.

**A. Petitioner's Claims That His Sixth Amendment Rights Were Violated Warrants Federal Habeas Relief**

David's first two claims are based on the assertion that his Confrontation Clause rights under the Sixth Amendment were violated when the redacted police statement of his co-defendant Christopher Jones was read to the jury at trial.  (Doc. No. 1-1 at 3-7.)

**1. The Introduction of Jones's Redacted Statement at Trial Was a Violation of Clearly Established Sixth Amendment Law**

The Confrontation Clause of the Sixth Amendment guarantees a criminal defendant the right "to be confronted with the witnesses against him."  U.S. Const. amend. VI.  The Supreme Court has interpreted the Sixth Amendment to include the right to cross-examine witnesses.  See Pointer v. Texas, 380 U.S. 400, 404 (1965).

In Bruton v. United States, the Supreme Court held that, even with a limiting instruction, the introduction of a non-testifying defendant's out-of-court statement, which directly implicated the defendant by name, violated the Confrontation Clause right of the co-defendant.  391 U.S. 123, 126 (1968).  The Supreme Court concluded that under these circumstances, a limiting instruction was inadequate because "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored."  Id. at 135.

Following Bruton, in Richardson v. Marsh, 481 U.S. 200 (1987), the Supreme Court considered the introduction of a redacted confession made by a co-defendant.  This confession was "redacted to omit any reference to the defendant, but the defendant [was] nonetheless linked to the confession by evidence properly admitted against him at trial."  Id. at 202.  The trial court

had also issued a limiting instruction to the jury. The Supreme Court held that "the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." Id. at 211.

The Supreme Court distinguished <u>Richardson</u> from <u>Bruton</u> on the grounds that the confession in <u>Bruton</u> expressly identified the defendant, whereas in <u>Richardson</u> the confession "was not incriminating on its face, and became only so when linked with evidence later introduced at trial." Id. at 208. Notably, in <u>Richardson</u>, the Supreme Court wrote that it "express[ed] no opinion on the admissibility of a confession in which the defendant's name has been replaced with a symbol or neutral pronoun." Id. at 211 n.5.

The Supreme Court partially addressed that question in <u>Gray v. Maryland</u>, 523 U.S. 185 (1998). In <u>Gray</u>, a co-defendant's confession was redacted to omit the names of two co-defendants. In place of the co-defendants' names were "blank white spaces separated by commas." Id. at 189. The trial court gave a limiting instruction directing the jury to only consider the statement against the confessing defendant. Id.

Upon review, the Supreme Court held that admission of the co-defendant's statement violated the defendant's Confrontation Clause rights, explaining that "redaction that replaces a defendant's name with an obvious indication of deletion, such as a blank space, the word 'deleted,' or a similar symbol, still falls within <u>Bruton</u>'s protective rule." Id. at 192. Additionally, the Court found that nicknames and specific descriptions identifying the defendant violate the Sixth Amendment. Id. at 197.

The Court surmised that these types of redactions encourage the jury to speculate about the references, stating that "the obvious deletion may well call the jurors' attention specially to

the removed name. By encouraging the jury to speculate about the reference, the redaction may

overemphasize the importance of the confession's accusation—once the jurors work out the

reference." Id. The Court concluded that the redacted statement in Gray was like the statements

in Bruton because it was "directly accusatory" and "powerfully incriminating." Id. at 194. On

the other hand, the statement in Richardson was not "directly accusatory evidence" because it did

"not point directly to the defendant at all." Id. The Court found that the critical difference is the

kind of inference the jury must make to connect a redacted statement to the co-defendant. Id. It

wrote:

> Richardson's inferences involved statements that did not refer directly to the
> defendant himself and which became incriminating "only when linked with
> evidence introduced later at trial." The inferences at issue here involve statements
> that, despite redaction, obviously refer directly to someone, often obviously the
> defendant, and which involve inferences that a jury ordinarily could make
> immediately, even were the confession the very first item introduced at trial.
> Moreover, the redacted confession with the blank prominent on its face, in
> Richardson's words, "facially incriminat[es]" the codefendant. Like the
> confession in Bruton itself, the accusation that the redacted confession makes "is
> more vivid than inferential incrimination, and hence more difficult to thrust out of
> mind."

Id. at 196 (citations omitted) (quoting Richardson, 481 U.S. at 208-09).

Following the Supreme Court's teaching, the Court of Appeals for the Third Circuit has,

on a few occasions, held that the use of a generic term in place of a defendant's name falls within

Bruton's protective rule.[5]

---

[5] Third Circuit decisions are not controlling here because habeas relief depends on whether the
Pennsylvania state court decisions were contrary to federal law as established by the United
States Supreme Court. See 28 U.S.C. § 2254(d) ("An application for a writ of habeas corpus
on behalf of a person in custody pursuant to the judgment of a State court shall not be granted
with respect to any claim that was adjudicated on the merits in State court proceedings unless
the adjudication of the claim—(1) resulted in a decision that was contrary to, or involved an
unreasonable application of, clearly established Federal law, as determined by the Supreme
Court of the United States; . . . ).

For example, in <u>Vasquez v. Wilson</u>, the Third Circuit held that a redacted statement replacing a defendant's name and that of an absent third party with "my boy" and "the other guy" in a two-person murder trial violated the defendant's Confrontation Clause rights because the jury would conclude that the present defendant, and not the absent party, was the shooter, despite providing a limiting instruction to the jury. 550 F.3d 270, 281 (3d Cir. 2008).

Similarly, in <u>Eley v. Erickson</u>, the Third Circuit found a violation of the Confrontation Clause where the trial court replaced two defendants' names with the words "the other two." 712 F.3d 837, 860-61 (3d Cir. 2013). The Court of Appeals reasoned that the Pennsylvania Superior Court unreasonably applied <u>Bruton</u> when it affirmed the trial court on the grounds that the redacted statement did not "refer to" the defendant. <u>Id.</u> at 861. The Court noted that "If—as we suspect—the Superior Court affirmed the trial judge through a mechanical application of the <u>Travers</u> bright-line rule, it thereby unreasonably applied clearly established federal law under <u>Bruton</u> and its progeny." <u>Id.</u>

Furthermore, in <u>Washington v. Secretary Pa. Dep't of Corrs.</u>, the Third Circuit held that a nontestifying co-defendant's statement substituting the defendant's name with "someone I know" and "the driver" and "the other guy" impermissibly violated the defendant's Confrontation Clause rights.[6] 726 F.3d 471, 473 (3d Cir. 2013). The Court of Appeals found

_____

[6] The United States Supreme Court granted certiorari in <u>Washington</u>, vacated the judgment, and remanded the case for further consideration based on <u>White v. Woodall</u>, 134 S.Ct. 1697 (2014). <u>See</u> <u>Wetzel v. Washington</u>, 134 S.Ct. 1935 (2014).

In <u>White</u>, the Supreme Court considered 28 U.S.C. § 2254(d)'s provision of allowing habeas relief where a state court's denial of a claim on the merits involved an unreasonable application of clearly established federal law. 134 S.Ct. at 1702. The Court explained that § 2254(d) "provides a remedy for instances in which a state court unreasonably [applies Supreme Court precedent]; it does not require state courts to <u>extend</u> that precedent or license federal courts to treat the failure to do so as error." <u>Id.</u> at 1706 (emphasis in original). On remand, the Third Circuit determined that its holding in <u>Washington</u> comported with <u>White</u> because it was "based

that the Pennsylvania Superior Court had "applied a blanket rule, derived from [Commonwealth v. Travers, 768 A.2d 845 (Pa. 2000)], that any redaction that would require a juror to consider an additional piece of information outside the confession in order to identify the co-conspirator being referred to automatically" was constitutionally permissible. Id. at 477. The court then found that the redaction used in Washington created a kind of inference that violated clearly established Supreme Court law because calling Washington "the driver" was tantamount to using his name given the other evidence describing Washington as the driver. Id. at 480 ("no reasonable reading of Bruton, Richardson, and Gray can tolerate a redaction that the trial judge knew at the time of introduction would be transparent to the jurors").

Most recently, in Colon v. Rozum, the Third Circuit held that introduction at trial of a co-defendant's statement violated the defendant's Confrontation Clause rights, notwithstanding redacting the defendant's name, substituting neutral pronouns such as "another person," and providing a limiting instruction. 649 F. App'x 259, 262-63 (3d Cir. 2016), cert. denied, 137 S.Ct. 1579 (2017). The Court of Appeals held that it was unreasonable for the state court to adopt a "blanket rule" that any redaction, neutral pronoun substitute, and limiting instruction would insulate the statement from a Sixth Amendment violation. Id. at 262. Applying such a blanket rule "misstate[s] the sensitivity a court must apply after Gray for the kind of inferences a

---

on the Superior Court's unreasonable application of well established federal law as defined by the Supreme Court, not on an unreasonable refusal to extend this law." 801 F.3d at 170. As noted, the Third Circuit explained that the Supreme Court in Gray held that a redaction cannot replace a defendant's name with descriptive terms, symbols, or obvious indications of deletion. Id. at 166-67 (citing Gray, 523 U.S. at 192-95). The Third Circuit then found that the use of the term "driver" in Washington violated all these rules because it described Washington's role in the crime and was a symbol and obvious indication of alteration to replace a name that was mysteriously absent. Id. at 167. On April 25, 2016, the Supreme Court denied certiorari in Washington. Wetzel v. Washington, 136 S.Ct. 1713 (2016).

statement permits jurors to make in actual trial contexts." Colon v. Rozum, No. 11-3921, 2014 WL 47770, at *8 (E.D. Pa. 2014), aff'd, 649 F. App'x 259 (3d Cir. 2016).

Given this legal backdrop, Petitioner challenged his conviction and sentence before the trial court, arguing that the admission of Jones's statement constituted an unreasonable application of Bruton, Richardson, and Gray. (See Doc. No. 21-1 at 7.) The trial court, however, held that it had not erred in admitting Jones's redacted statement because it had instructed the jury not to consider the statement against Petitioner and all references to Petitioner were replaced with neutral pronouns. (Id. at 13-14.) The trial court relied on Bruton and Travers to come to this conclusion. (Id.) In Travers, the Pennsylvania Supreme Court held that a reference to the defendant as "the other man" in a redacted statement did not violate the Confrontation Clause because it was not an obvious alteration and was not incriminating on its face. Travers, 768 A.2d at 848. Using Travers in reviewing David's conviction, the trial court explained that "[t]he Pennsylvania Supreme Court 'has specifically approved of redaction and a limiting instruction as a means of eliminating any possible prejudice arising from the admission of a co-defendant's confession at a joint trial.'" (Doc. No. 21-1 at 13 (quoting Travers, 768 A.2d at 848).). In addition, the trial court cited Bruton when stating that the "[c]o-defendant's statement was appropriately redacted for purposes of the defendant's trial." (Doc. No. 21-1 at 6 n.18.) The trial court found that it had not erred and that Petitioner was not entitled to relief. (Doc. No. 32 at 14.)

The Pennsylvania Superior Court affirmed, adopting the trial court's opinion. (Id.) The Superior Court did not mention Bruton, Richardson, or Gray in its affirmance of the trial court's opinion that it had not erred in allowing Jones's redacted statement to be read to the jury. See

<u>Commonwealth v. David</u>, No. 2309 EDA 2008, slip op. (Pa. Super. Ct. Nov. 25, 2009). Instead, the Superior Court stated generally:

> The December 3, 2008 trial court opinion is detailed, thorough, and well-reasoned. For this reason, we adopt the opinion of the Honorable M. Teresa Sarmina and affirm the judgment of sentence on its basis.

(<u>Id.</u> at 10.)

As previously noted, the Magistrate Judge concluded that the Pennsylvania courts unreasonably applied clearly established federal law when deciding that the admission of Jones's statement did not violate Petitioner's Confrontation Clause rights. (Doc. No. 32 at 17.) Respondents object to this conclusion and contend that the state court decisions were reasonable because the Supreme Court has never barred the use of neutral phrases such as "the other guy" in redacted statements. (<u>See</u> Doc. No. 38 at 1-2.) Respondents, however, "ignore the practical reality of this case as well as the rationale of the Supreme Court holdings." (Doc. No. 32 at 18.)

Upon review of the record, this Court agrees with the Magistrate Judge. The R&R explains that:

> The state courts in this case unreasonably applied <u>Bruton</u>, <u>Richardson</u>, and <u>Gray</u> by concluding that the admission of Jones's statement did not violate David's Confrontation Clause rights because the trial court provided limiting instructions and David's name was replaced with "neutral pronouns." <u>See</u> 12/3/2008 Tr. Ct. Op. at 12; 11/25/2009 Super. Ct. Op. at 10. . . . Redactions that replace a defendant's name with "an obvious indication of deletion," or specific descriptions that make it clear that the statement is referring to the defendant, violate the Confrontation Clause. <u>Gray</u>, 523 U.S. at 192, 195; <u>see also</u> Comwlth. Resp. at 12 (acknowledging that Supreme Court in <u>Gray</u> assumed redactions with specific descriptions violate <u>Bruton</u>).
>
> Unlike the redaction used in <u>Richardson</u>, the redaction here did not focus on the other participants in the crime and eliminate David's existence. David played a predominant role in Jones's statement, referenced as "he," "him," "the other guy," "the person who shot" Clayton, and "the shooter." 11/26/2006 Interview Record at 1-3. Although innocuous in the abstract, when considered in the context of the statement and the manner in which it was presented, the redactions were obvious signs that the statement had been altered to remove David's name.

In the redacted statement, Jones said he knew the person who shot Clayton, but was never asked to name this person. <u>Id.</u> at 1-2; N.T. 2/7/2008 at 171-72. In contrast, Jones named Kyle, the person who introduced him to David, and was then asked to provide Kyle's full name. 11/26/2006 Interview Record at 2; N.T. 2/7/2008 at 173. This approach was sure to raise confusion or suspicion in the jurors' minds. <u>See</u> <u>Gray</u>, 523 U.S. at 193; <u>Washington</u>, 801 F.3d at 167. Further, as the prosecutor argued in his closing, Jones's statement proved there was a conspiracy between Jones and one other person to rob Clayton. <u>See</u> N.T. 2/13/2008 at 271. David was the only other person alleged to have participated with Jones in the robbery and murder. By referring to "the shooter," the redacted statement also described David's role in the crime, as argued by the Commonwealth, and suggested by Yancey's and Saunders's testimony.

Despite the redactions, the jury was sure to realize that Jones was referring to David. <u>See</u> <u>Gray</u>, 523 U.S. at 193 ("A juror who does not know the law and who therefore wonders to whom the blank might refer need only lift his eyes to [the defendant], sitting at counsel table, to find what will seem the obvious answer, at least if the juror hears the judge's instruction not to consider the confession as evidence against [the defendant], for that instruction will provide an obvious reason for the blank."). The redactions inescapably pointed to David as the robbery accomplice and shooter. This created a risk that the jury, despite the court's limiting instructions, considered Jones's incriminating statements against David in violation of clearly established Supreme Court law, as set forth in <u>Bruton</u>, <u>Richardson</u>, and <u>Gray</u>.

(<u>Id.</u> at 17-19.) The manner in which Jones's statement was read to the jury created "obvious

signs that the statement had been altered to remove David's name." (<u>Id.</u>) Petitioner was the only

other person charged in the murder and robbery of Clayton. When reading Jones's statement that

refers to "the shooter" and "the other guy" in a two-person trial, there was an inexorable risk that

the jury would draw the conclusion that Jones was referring to Petitioner, and would consider

Jones's confession as evidence of Petitioner's guilt. (Doc. No. 1-1 at 4.)

In addition, the state court decisions did not adequately analyze under <u>Bruton</u>,

<u>Richardson</u>, and <u>Gray</u> whether Petitioner's Confrontation Clause rights were violated by the

admission of the redacted statement. The state courts briefly mentioned <u>Bruton</u> when making the

blanket statement that the "[c]o-defendant's statement was appropriately redacted for purposes of

the defendant's trial." (Doc. No. 21-1 at 6 n.18.) The Superior Court did not analyze <u>Bruton</u> or its progeny, but instead affirmed the "detailed, thorough, and well-reasoned" opinion of the trial court. <u>See</u> <u>Commonwealth v. David</u>, No. 2309 EDA 2008, slip op. (Pa. Super. Ct. Nov. 25, 2009). Such analysis, without more, "misstate[s] the sensitivity a court must apply after <u>Gray</u> for the kind of inferences a statement permits jurors to make in actual trial contexts." <u>Colon</u>, 2014 WL 47770, at *8. For these reasons, the state courts unreasonably applied clearly established Supreme Court law in finding that Petitioner's Sixth Amendment rights were not violated by the introduction of Jones's redacted statement at trial.

### 2. The Introduction of Jones's Redacted Statement Had a Substantial or Injurious Effect on Petitioner's Trial to Merit Relief

Petitioner argues that the admission of Jones's redacted statement had a substantial and injurious influence on the jury's verdict. (Doc. No. 1-1 at 3-7.)

Notwithstanding a district court's determination that the use of a defendant's redacted statement in a joint trial violated a co-defendant's right to confront the witnesses against him, the court must still determine whether those errors can be considered harmless. <u>Rainey v. Secretary of Pa. Dept. of Corrs.</u>, 658 F. App'x 142, 152 (3d Cir. 2016).

To be entitled to habeas relief, a petitioner must establish that the trial error "had [a] substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993). Under this test, a district court may grant relief only if it has a "grave doubt" as to whether the error at trial had a substantial and injurious effect or influence. <u>Davis v. Ayala</u>, 135 S.Ct. 2187, 2198 (2015) (quoting <u>O'Neal v. McAninch</u>, 513 U.S. 432, 436 (1995)). In other words, "[t]here must be more than a 'reasonable possibility' that the error was harmful." <u>Davis</u>, 135 S.Ct. at 2198 (quoting <u>Brecht</u>, 507 U.S. at 637). This standard

under <u>Brecht</u> reflects the view that a court must find "the defendant was actually prejudiced by the error." <u>Davis</u>, 135 S.Ct. at 2198.

Courts may use several factors to guide its review of Confrontation Clause errors, including:

> [T]he importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

<u>Johnson v. Lamas</u>, 850 F.3d 119, 133 (3d Cir. 2017) (quoting <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 684 (1986)). The Court will address each factor in turn.

The first factor—the importance of Jones's statement in the Commonwealth's case—weighs in favor of Petitioner. Jones's statement was "important," as it was the only evidence which provided a cohesive story of the murder and robbery of Clayton. <u>Van Arsdall</u>, 475 U.S. at 684. The importance of Jones's statement was demonstrated by the Commonwealth's reliance on it in its summation to the jury:

> From the statement – and it's clear – they were going there to rob Craig. They knew he was the sneaker man. . . . And they lured the sneaker man from the area that he usually sold at, Kensington and Allegheny, onto Clementine Street. . . .

(Doc. No. 32 at 9 (quoting N.T. 2/13/2008 at 271).) The Commonwealth emphasized the statement in closing arguments because it explained the criminal conspiracy between Jones and Petitioner to rob Clayton. (Doc. No. 32 at 9.) Without the statement, the Commonwealth could not portray the murder as a robbery gone wrong. Jones's statement was, in essence, the critical evidence that tied the Commonwealth's theory of the case together.

More consequential still is that in the midst of deliberations, the jury requested a copy of Jones's statement. (<u>Id.</u>) The trial court told the jury that it could not review the statement, but it

could be re-read to them.  (Id.)  At the jury's request, Jones's statement was re-read to them twice before they continued to deliberate.  (Id.)  In this context, there can be no doubt about the statement's importance to the convictions against Petitioner and Jones.  Given these circumstances, the admission of Jones's statement was important to the Commonwealth's case.  This first Van Arsdall factor weighs in favor of Petitioner.

The second factor, which examines whether Jones's statement was cumulative, also weighs in favor of Petitioner.  Jones's statement was for the most part not cumulative.  See Ali v. Administrator of New Jersey State Prison, 675 F. App'x 162, 165 (3d Cir. 2017), petition for cert. filed, No. 16-9543 (U.S. Jun. 13, 2017) (finding that the erroneously admitted testimony of a co-defendant was "for the most part not cumulative, given that [the co-defendant's] account of [the petitioner's] motivation, of how [the petitioner] planned his entry into the victims' home, and of what occurred inside the home did not duplicate any other witness's testimony").  Jones's statement provides the only account of Petitioner's motivation for the murder and robbery.  It detailed how the men met two days before the shooting, how they contacted the victim to buy sneakers the night before the incident, and how they convinced the victim to meet them on Clementine Street the day of the murder.  It also was the only direct evidence detailing the exchange between them and the victim.  In addition, it provided the only evidence suggesting a Bluetooth headset was taken from the victim.  (See Doc. No. 1-1 at 6 ("It wasn't untill [sic] the codefendant Jones's statement was read before the jury that added the intent of robbery, a missing blue tooth [sic], sneaks being in a bag; and most importantly, 'the other guy' being 'the shooter', and planner of events.")  This second factor, therefore, weighs in favor of Petitioner.

The third Van Arsdall factor considers "the presence or absence of evidence corroborating or contradicting [Jones's statement] on material points."  Van Arsdall, 475 U.S. at 684.  The

Commonwealth asserts that Jones's statement was corroborated by eyewitness testimony, phone records, and notations to "Mike" and "Size 12 Tims" in the victim's notebook. (Doc. No. 38 at 10.)

The Commonwealth relies on the eyewitness identifications from Yancey and Saunders to corroborate Jones's statement. Testimony from Yancey and Saunders at trial corroborated Jones's statement to the extent that two men were seen on the 1800 block of Clementine Street shortly before the shooting and that the two men ran in different directions when Yancey shouted out from the window that she was calling the police. The statement also was corroborated by Yancey and Saunders' identification of Petitioner at trial.[7] In addition, the phone records taken from Jones's cell phone corroborate his statement that someone called Clayton from that cell phone multiple times the night before and the day of the murder. Last, the annotations of "Mike" and "Size 12 Tims" written in the victim's notebook corroborate Jones's statement that he and Petitioner contacted Clayton to buy sneakers from him. However, Petitioner contradicted the statement in part when he testified that "nobody called him 'Mike' and wore shoes between sizes 12 and 13." (Doc. No. 32 at 21.) The existence of this evidence corroborating Jones's statement on material points weighs in favor of harmless error.

The fourth factor—the extent of cross-examination otherwise permitted—weighs in favor of Petitioner. Detective Cahill read Jones's full statement to the jury, redacting Petitioner's name

---

[7] Yancey testified that, a few weeks after the murder, she identified Petitioner's photograph. (Doc. No. 32 at 4.) Approximately three months thereafter, she identified him again at a police line-up. (Id.) She subsequently identified Petitioner at the first trial and at the re-trial with Jones. (Id.) Although Yancey identified Petitioner at the first trial, Saunders did not. (Id.) Saunders originally told investigators that she did not remember what the men looked like. Therefore, she was not asked to identify Petitioner at a line-up. (Id.) Saunders did not identify Petitioner at the first trial. Only at the re-trial, approximately two and a half years after the murder, did Saunders identify Petitioner. (Id.) While testifying, Saunders explained that she had failed to identify Petitioner at the first trial because she was scared. (Id. at 5 n.4.)

with references to "the person who shot" Clayton, "he," "him," "the shooter," and "the other guy." (Id. at 6.) The inability to cross-examine Jones about the statement deprived Petitioner of the opportunity to demonstrate to the jury Jones's potential bias, that is, that Jones made the statement to curry favor with law enforcement in return for leniency in sentencing. Exposing Jones's ulterior motives for providing the statement to police could have undermined the Commonwealth's case against Petitioner. Such cross-examination may well have influenced the jury's assessment of Jones's credibility in making the statement to Detective Cahill. In addition, it deprived Petitioner of the opportunity to elicit any contradictions or discrepancies between the statement and potential cross-examination testimony Jones may have given. The jury might have received a significantly different impression of Jones's statement had Petitioner been able to cross-examine him. The fourth Van Arsdall factor, therefore, weighs in favor of Petitioner.

The final factor concerning the overall strength of the prosecution's case also weighs in Petitioner's favor, as the case against him was less than overwhelming. Here, Respondent contends that "there was never any doubt that Clayton was murdered, and . . . the Commonwealth's evidence left no question as to who killed him, with or without Jones's confession into evidence." (Doc. No. 38 at 10.) Petitioner to the contrary argues that the Commonwealth's evidence, without the statement, would have been insufficient to convict him. (Doc. No. 1-1 at 4-6.) He points to the fact that "the jury was unable to reach a verdict in David's first trial, which featured similar identification testimony from Yancey and evidence about the notebook, but lacked the evidence of Jones's redacted statement." (Doc. No. 32 at 22.)

The overall strength of the Commonwealth's case, without Jones's statement, was slight. For example, the testimony of Yancey and Saunders, two eyewitnesses in the case, were problematic. As the Magistrate Judge explained:

The evidence against David consisted primarily of Yancey's and Saunders's eyewitness identifications, neither of which was compelling. See United States v. Wade, 388 U.S. 218, 288 (1967) ("The vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification."); see also Dennis v. Sec'y, Pennsylvania Dep't of Corr., 834 F.3d 263, 314-35 (3d Cir. 2016) (McKee, J. concurring) (noting an "impressive body of scholarship and research has revealed that eyewitness accounts can be entirely untrustworthy" and discussing cases involving mistaken identifications and scientific studies detailing problems with human visual perception and recall). Although Yancey had identified David in a pre-trial photo array and line-up, her ability to see the suspects around the time of the crime was suspect. She testified that she initially viewed the men from a distance of about seven or eight feet around 10:30 p.m. the night before the murder. N.T. 2/7/2008 at 204-08. Caceras, who had seen the men an hour earlier, testified it was dark and he could not make out their faces. N.T. 2/5/2008 at 266. Yancey, however, claimed to see the men's faces in the street lighting. N.T. 2/7/2008 at 208. Yancey testified that she saw the men again the next morning. First, from her upstairs bedroom window before the shooting, and second, for less than two minutes from her doorway after the shooting. Id. at 214-18, 227. Both of those times, the suspects were many feet away from Yancey. Yancey also was not wearing her glasses. Although she claimed that did not impact her view, she said otherwise to the 911 operator on the day of the crime. Id. at 262-64 (reporting she had difficulty seeing without glasses). Yancey further described both men as wearing hoods, which limited her ability to see their heads and entire face. Id. at 220. Saunders's identification of David was problematic because she identified him for the first time during the second trial, more than two and a half years after the murder. N.T. 2/6/08 at 157, 166. Immediately after the shooting, she told the police that she could not quite remember what the suspects looked like, but then provided a description of the men that was very similar to that provided by her mother. N.T. 2/7/2008 at 188, 178-79. She later informed Yancey that she did not want to view a line-up of the suspects because she could not remember what the men looked like. Id. at 271, 348. Saunders also had been unable to identify David when she testified during his first mistrial. Id. at 257.

(Id. at 19-21.) The testimony of Yancey and Saunders contained issues, which call into doubt the reliability of these identifications. It would be difficult to conclude that the evidence from these two eyewitnesses proved beyond a reasonable doubt that Petitioner was responsible for the murder of Clayton.

In addition, without Jones's statement, the phone records upon which the Commonwealth relies do not point to Petitioner at all. "Although Jones's phone records showed numerous calls

between his and Clayton's cell phones the night before and the morning of the murder, those records linked only Jones to the crime, and not David." (Id. at 21.) Petitioner is linked to the phone records only through Jones's statement. (Id.) These records do not show evidence independent of Jones's statement linking Petitioner to the robbery and murder of Clayton.

Respondents rely on Johnson v. Lamas, 850 F.3d 119 (3d Cir. 2017), contending that any error the trial court made in admitting Jones's redacted statement was harmless. (Doc. No. 38 at 10.) In Johnson, the Third Circuit concluded that a state trial court erred when it allowed a co-defendant's statement to be admitted against the defendant. 850 F.3d at 122. However, the Court of Appeals found that testimony from two eyewitnesses "who were well-acquainted" with the defendants in the case and "whose mutually corroborative testimony established that [the defendant] stood on the passenger side of the car" near where the victim was shot demonstrated that any error in admitting the co-defendant's statement against the defendant was harmless. Id. at 136-37.

This case, however, is distinguishable from Johnson. First, Yancey and Saunders did not see the two men on Clementine Street interact with Clayton. In Johnson, the eyewitnesses testified that the defendant was near the car that the victim was driving and appeared to be speaking to the victim when they heard shots fired. Johnson, 850 F.3d at 123, 127. Here, Yancey and Saunders did not see any interaction between Clayton and Petitioner on Clementine Street. In fact, they did not see Clayton at all until after the police were called to the scene.

Second, Yancey and Saunders never saw a gun. Conversely, in Johnson, one eyewitness testified that she saw that both defendants had guns in their hands during their confrontation with the victim. Johnson, 850 F.3d at 127-28. No such testimony was given in this case, nor was any gun ever recovered from Petitioner or Jones.

Most significantly, Yancey and Saunders were not "well-acquainted" with Petitioner as the eyewitnesses were with the defendant in <u>Johnson</u>. The two eyewitnesses in <u>Johnson</u> were prostitutes who purchased drugs from the defendant several times a day and had known him for years. <u>Johnson</u>, 850 F.3d at 122-23, 126. In contrast, Yancey had never seen the men on Clementine Street until one day before the murder. Saunders only glanced at the men in passing while walking to her mothers' home shortly before the shooting. Identifying a stranger is not the same as identifying someone who the witness is well-acquainted with and has seen on a routine basis for years.[8]

Considering the gaps and problems in the eyewitness testimony and the lack of other direct evidence, Petitioner has shown "more than a 'reasonable possibility'" that the statement itself was harmful. <u>Davis</u>, 135 S.Ct. at 2198 (quoting <u>Brecht</u>, 507 U.S. at 637).

In short, the <u>Van Arsdall</u> factors militate in favor of granting the writ. Under these circumstances, the error in admitting Jones's statement in the form read to the jury at trial had a "substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht</u>, 507 U.S. at 637 (citation omitted). Jones's statement was the only evidence explaining the motivation for the robbery and murder. Cross-examination of Jones could well have undermined his credibility, causing the jury to disbelieve, or at least seriously doubt, his redacted statement identifying Petitioner as the shooter. And without Jones's statement linking Petitioner to the murder, the jury may well have concluded that the prosecution had not proven Petitioner's guilt beyond a reasonable doubt.

The trial court's charge to the jury highlighted, on two separate occasions, the importance of considering Jones's statement only against Jones, and not Petitioner. But the jury was not in

---

[8] Moreover, there was no forensic evidence linking Petitioner to the crime, such as fingerprints or DNA found on the victim.

possession of facts sufficient to make any appraisal of Jones's credibility.  They simply did not have the information needed to properly evaluate Jones's motives and to give his statement the weight they thought it deserved.  This scenario not only violated Petitioner's Confrontation Clause rights, but also undermined the fact-finding and truth-seeking function of the trial.  Given the well-established principle of the importance of cross-examination to a jury's assessment of each witness's credibility, the centrality of Jones's statement to the prosecution's case, and the fact that Petitioner's first trial resulted in a mistrial, it would stretch the meaning of the word "harmless" too far to conclude that the complete lack of cross-examination did not affect the jury's verdict.  This conviction, therefore, cannot stand.

## V.    CONCLUSION

For the foregoing reasons, the Court will approve and adopt the Magistrate Judge's Report and Recommendation, granting the Petition for a Writ of Habeas Corpus.  An appropriate Order follows.